Filed 4/26/22  P. v. Hughes CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>EDWARD CULVER HUGHES,<br><br>       Defendant and Appellant. | A161730<br><br>(Del Norte County Super. Ct.<br> No. CRF199082) |

Defendant Edward Culver Hughes appeals from the final judgment of conviction of second degree murder based upon alleged instructional error and prosecutorial misconduct.  Defendant also challenges the trial court's imposition of a restraining order at judgment and sentencing which precludes defendant from contact with his minor son for 10 years.  We find that (1) defendant's claims of error have been forfeited by his failure to object in the trial court; (2) defendant's Sixth Amendment right to effective assistance of counsel was not violated; and (3) defendant's claims of error either lack merit or constitute harmless error.  Accordingly, we affirm.

## BACKGROUND

On August 2, 2019, the Del Norte County District Attorney filed an information charging defendant with second degree murder (Pen. Code,

1

§ 187, sub. (a))[1] and misdemeanor cruelty to a child by endangering health (§ 273A, sub. (b)).  Following a jury trial, defendant was convicted on November 18, 2020, of both counts.  The court sentenced defendant on December 23, 2020, to 15 years to life in prison with a six-month concurrent term for the misdemeanor count.  At judgment and sentencing, the court imposed a criminal protective order which precluded defendant from contacting his then two-year-old son for 10 years.  Defendant filed a timely notice of appeal from the judgment.

### *Summary of Evidence Presented at Trial*[2]

In December 2018, defendant was living in a trailer park in Crescent City, California with his wife Emiley, their one-year-old son (referred to herein as defendant's son or "the baby"), and Emiley's son W. and daughter A.[3]

On Christmas Eve, Emiley stayed in her bedroom because she was not feeling well.  W. took care of his siblings and brought food to his mother.  Just before midnight, W. entered the  bedroom where Emiley and defendant were sleeping and placed the baby in his crib.  A. and a 12-year-old neighbor C., were asleep on a fold-out bed in the living room.  After putting the baby in his crib, W. went to bed in his room.

At some point that night, C. was awakened to the sound of arguing coming from Emiley and the defendant's bedroom.  C. later heard the sound of "shuffling, like moving stuff around in the room."

---

[1] All statutory references are to the Penal Code.

[2] As the parties are familiar with the facts, we limit our discussion to the facts necessary to resolve the issues raised on appeal.

[3] W. was 12 years old at the time of trial in November of 2020. Respondent's brief states that W. was 10, A. was six, and the baby was one year old when their mother was killed.

Between 2:00 and 2:30 a.m., C.'s mother, C.T., was outside on her porch smoking a cigarette when she saw defendant and Emiley walking toward the trailer park exit. C.T. heard Emiley say that she wanted a soda. Emiley's voice sounded loud and slurred, as if she had been drinking alcohol. Defendant got in front of Emily with his hands extended, saying "we have to go back[.]"

The family's next door neighbor heard Emiley yelling from inside her home sometime between 2:00 and 2:30 a.m. on Christmas Day. Emiley said, "Why did you call me that? Why are you doing that to me, why are you calling me that?" W. testified that sometimes the defendant and his mother got into arguments after she had been drinking.

Early on Christmas morning, defendant called Mary Cooper, the manager of the Northcrest Patriot gas station where Emiley worked, to explain that Emiley had hidden her medication, was "freaking out," and would not come in to work that day. Cooper thought it was odd that defendant was whispering and that the background of the call was "dead silent."

Emiley did not come out of the bedroom on Christmas morning. Defendant told W. that his mother was sick; he told C. that Emiley was at work. Defendant had purchased Christmas gifts for the children. W. testified that the defendant showed the children their gifts and "just let us be after that, really." Defendant initially refused to allow W. to enter the bedroom on Christmas Day even though it was the only way to access the bathroom which had a working toilet. When defendant allowed W. to use the bathroom later that day, W. saw a lump of blankets on his mother's bed, but did not see his mother. The next day, defendant told W. that Emiley went to visit a friend whose child had died.

On December 26, 2018, Cooper texted Emiley's cell phone because Emiley had not shown up for work. Cooper texted Emiley's cell phone again on January 3, 2019, to let her know that she had been terminated for missing work and that she could pick up her final paycheck. The next day, Cooper received a text from Emiley's phone which read " 'I, Emiley Hughes, give permission for Edward Hughes to come pick up my check.' " Cooper received another text from Emiley's phone which stated: "I'm having a blast, I deserve a break. Is Eddie saying horrible things about me?"

Defendant began telling W. and others that Emiley went to Eureka to do drugs and had abandoned her children. W. noticed that a security camera was missing from the carport and that his mother's laptop was also missing. W. eventually moved in with his grandmother. On February 1, 2019, W.'s grandmother filed a missing person report on Emiley.

On January 6 or 9, 2019, defendant's coworker Lindsay Erb visited defendant's home to help him with chores. Erb noticed lit tea candles in the bathroom and cleaning products in the bedroom; the presence of the cleaning products seemed odd because the house was not clean. While Erb folded laundry in the bedroom, defendant sat in front of the bedroom closet looking at pornography on a laptop computer. The baby was crawling around on the countertops and on the back of the couch, unattended. Defendant rebuffed Erb's offer to help with the baby.

After Emiley went missing, defendant sometimes brought A. and the baby to the home of his coworker Grant Hodges. Hodges noticed that the children had a strange, foul odor about them, and that the baby usually needed a diaper change, had diaper rash, and wore clothes that were too small for him. Defendant was verbally abusive to the baby, particularly if the baby was crying. Sometimes defendant grabbed the baby by his arms and

4

brought him down abruptly on pieces of furniture. Hodges reported the situation to Child Protective Services twice.

W. also witnessed defendant abuse the children. W. described defendant throwing A. around and sitting on her until she couldn't breathe. When the baby cried, defendant would get upset and tell the baby, "I'm going to pound your head in." Defendant was emotionally abusive to W., calling him "ugly," and "faggot," and telling W., "You were never my son." Once defendant offered to teach W. to fight, but instead, broke W.'s glasses while placing him in a chokehold so tight that W. could not breathe.

On February 6, 2019, defendant visited Christopher Roberts's home with the baby. Roberts saw defendant push the baby down as the child moved towards him. The baby "laid on its side, kind of looking up, didn't try to get back up" as if "used to that type of treatment." As defendant was leaving, he mimed hitting the baby against the fence, stating that he should "just bash his head on the fucking thing."

Defendant told Hodges before and after Emiley went missing that he wanted to kill his wife by choking, shooting, stabbing, or "snapping her neck." On at least 40 occasions, defendant told Hodges that he wanted to choke Emiley. The comments were so frequent they were like "white noise." W. testified that although he had never seen defendant hit his mother, defendant would often "act like he was going to hit her" by jumping at her with his fist a few inches from her face. On one occasion around Thanksgiving of 2018, while Emiley and defendant were arguing, Emiley called for help and told W. to "call the cops."

On February 11, 2019, a Del Norte sheriff's deputy attempted to follow up on Emiley's disappearance. Defendant promised the deputy during a telephone call that he would return home to speak with him, but defendant

5

never showed up. The deputy's subsequent calls went to defendant's voicemail.

W. and his grandmother went to defendant's trailer on February 14, 2019, to get some of W.'s belongings. W. discovered his mother's decomposing body in the master bedroom closet. When the police arrived at the trailer, they found Emiley's body in the closet in the fetal position wrapped in a sheet. There was a can of body spray and bottles of bleach and degreaser in the bedroom that appeared to have been used to mask the odor of decomposition.

Defendant was arrested on February 18, 2019, at Shana Early's home in Crescent City. Defendant was uncooperative and refused to surrender. The Pelican Bay Crisis Response Team used tear gas to force defendant out of Early's home. While defendant was in custody awaiting trial, jail staff recorded telephone calls between defendant and Early in which defendant referred to Early as his "soul mate" and the couple spoke about wanting to get married.

Sergeant Gill of the Del Norte Sheriff's Office interrogated defendant following his arrest. Defendant told Sergeant Gill that he had been clean for three years. At trial, defendant insisted that he had been high on methamphetamine during the interrogation, even though Sergeant Gill did not see any signs that defendant was under the influence of narcotics or alcohol. During the interrogation, defendant gave several different accounts of how Emiley died: He initially stated that he had blacked out and did not know how she died; he then stated that he hit Emiley in the throat to block her from hitting him; and finally, defendant admitted that he choked Emiley until she fell over, and he "just kept choking her" until she died.

6

At trial, defendant testified that he and Emiley had been drinking alcohol on Christmas Eve, 2018. Defendant drank more than usual because he was also using methamphetamine. Emiley and defendant left the trailer in the early morning hours because Emiley wanted to get drugs from a friend.[4] Defendant testified that he tried to discourage Emiley; after they saw C.T., he insisted that they return to the trailer.

While Emiley was in the bathroom adjacent to their bedroom, defendant noticed that someone sent a text to her phone. Defendant replied, "not to come to my fucking house." When Emiley discovered that defendant had used her phone, "she hit [him] in the back of the head, turned around, she started hitting [him] again." On direct examination, defendant testified that he "snapped" and defended himself by hitting Emiley in the throat with his hand. On cross-examination, defendant admitted that he had choked Emiley until she was dead, but said that her death was "an accident." On redirect, when asked to tell the jury, "what was in your mind at the time that you strangled her," defendant replied, "I don't remember, I really don't . . . just spur of the moment." When his counsel persisted, asking, "You testified that you kept choking her, do you have any idea why?" Defendant responded, "I have no idea why I said that."

Forensic Pathologist James Olson testified that the cause of Emiley's death was "homicidal violence with findings suggestive of strangulation." The state of decomposition of Emiley's body at autopsy was consistent with having been killed on Christmas Day. There was no evidence of hemorrhage in the tissue of Emiley's hands as might have been present if she had punched a person in the back of the head. Dr. Olson did not find evidence of

---

[4] According to defendant, Emiley had relapsed on methamphetamine about two months before Christmas.

an injury to Emiley's neck consistent with a blow to the neck. However, he did observe a "fracture through bone in the superior horn of the thyroid cartilage on the left side," an injury that is commonly seen in cases of manual strangulation. The toxicology report from the autopsy was positive for over-the-counter cold medicine, Emiley's prescription anti-depressant medication, and alcohol;[5] there were no illicit drugs in Emiley's system at the time of death.

Dr. Olson testified that most people who are choked lose consciousness within 10 to 15 seconds, and, if the choking stops, a person will typically regain consciousness in less than 30 seconds. In order for strangulation to result in death, "you typically have to continue to apply the pressure to the point that you block the vessels, you block the respiration. So brain death happens within four to six minutes where it's irreversible."

### Proceedings Relevant to Defendant's Claims of Instructional Error and Prosecutorial Misconduct

Prior to closing arguments, the trial court met with counsel in a closed courtroom to discuss jury instructions. The court and counsel engaged in the following dialogue regarding the jury instructions for second degree murder and manslaughter:

"The court: And then turning to 520, Instruction 520, second degree murder with malice aforethought; is that acceptable as presented by the People, first to the People?

"Mr. Zocchi: Yes.

---

[5] The blood alcohol level was 0.19. Dr. Olson explained that bacterial organisms present in the body during decomposition can cause elevated blood alcohol results. While the toxicology results suggested that Emiley had consumed alcohol before death, it was impossible to determine how much she had consumed.

"The court:  Then to the defense."

"Mr. Fallman:  Yes.

"The court:  Then turning to Instruction 570, voluntary manslaughter, heat of passion, lesser included offense, is that acceptable as presented by the People, first to the People?

"Mr. Zocchi:  Yes.

"Mr. Fallman:  Yes."

The court instructed the jury on voluntary manslaughter by reading CALCRIM No. 570.[6]

---

[6] CALCRIM No. 570 states as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.

"The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1.  The defendant was provoked;

"2.  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3.  The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for a heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific

9

During his closing argument, the prosecutor defined second degree murder and cited some of the evidence which he believed supported this charge. He told the jury that "voluntary manslaughter is something less than murder. And it starts out with the defendant was provoked." The prosecutor explained that "[t]he instruction further goes on, talks about Element 3, how the provocation would have caused a person of average disposition to act rashly and without due deliberation, average disposition."

The prosecutor then made the following comments, which are the basis of defendant's claim of prosecutorial misconduct:

"[I]t's not what Edward Hughes would do. It is what an average person would do in that situation.

"So an average person would come to their senses and stop strangling their wife to death. That's what an average person would do.

---

type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for an ordinary person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, then you must find the defendant not guilty of murder."

10

"If enough time passed between the provocation and the killing for an ordinary person of average disposition to regain his clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"Heaven forbid if you believe his lies, that she hit him, and what would it take for an average person to cool off.

"Have you ever heard the expression take a deep breath and count to ten?  Take a deep breath and count to ten.  So after ten to 15 seconds, she passes out.  A normal person would have came to reason.  And then you have four more minutes after that, . . . another 240 seconds when you are holding your limp wife defenseless, passed out, can't say anything, can't do anything to you.  And you are holding her and you are choking her.

"In the time it takes to kill her, an ordinary person would have stopped.  The reason he didn't stop was because he wanted her dead. . . .  [¶] . . . [¶]

"[S]trangulation has a built-in . . . cooling off period.  Ten to 15 seconds it takes for somebody to pass out.  And then four to six minutes it takes to kill them.  At least 240 seconds built in.  And no ordinary person . . . would continue to do that and try to lie to you because strangulation is murder.  Plain and simple, strangulation is murder.  It's murder."[7]

After commencing deliberations, the jury asked the court to respond to the following question:  "[T]he provocation would have caused a person of average disposition to act rashly and without deliberation, that is from passion rather than from judgment, please explain and clarify."  The court invited suggestions from counsel as to how to respond to the jury's query.

---

[7] In his rebuttal closing argument, the prosecutor returned to this theme, stating, "An ordinary person wouldn't continue to strangle their wife for another four minutes.  An ordinary person would come to their senses and let go."

The prosecutor suggested re-reading the portion of CALCRIM No. 570, which emphasized that the standard was objective, and that the jury must determine whether the provocation was sufficient. Defense counsel told the court that "the safe thing to do is tell them to read that instruction in its entirety, carefully," noting that to do otherwise "unfairly draws attention to . . . part of that instruction." Defense counsel declined the court's suggestion that each side have an opportunity to give further closing argument to the jury on this issue, stating, "[O]pening up argument to both of us similarly puts the potential for human error on a point where they [the jury] are already confused." Defense counsel noted that "they [the jury] have what the State has approved as the proper instruction." After considering counsel's arguments, the trial court stated that it was "inclined to respond to the query by reading the whole instruction, not taking anything out of context, I will simply reread it in regard to what the law is in regard to provocation and its application in this case." Both attorneys stated this was acceptable.

## DISCUSSION

## I.

### *Defendant Forfeited His Claim That the Prosecutor Committed Misconduct During Closing Argument*

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " ' " (*People v. Williams* (2013) 56 Cal.4th 630, 671, quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 181.) " 'Under state law, a prosecutor who uses such methods commits misconduct

12

even when those actions do not result in a fundamentally unfair trial.' " (*Williams*, at p. 671.)

" 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.]  When a claim of misconduct is based on the prosecutor's comments before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Williams, supra,* 56 Cal.4th at p. 671; see also, *People v. Panah* (2005) 35 Cal.4th 395, 462.)

Defendant acknowledges that defense counsel failed to object to the portions of the prosecutor's closing argument which he now cites as misconduct.  Defendant contends that his failure to object should be excused as futile under *People v. Hill* (1998) 17 Cal.4th 800, 820, arguing that the "emotional impact of encouraging jurors to put themselves in the situation of 'holding your limp wife defenseless, passed out' could not have been undone simply by an admonition."  Defendant points to the jury's request for further explanation of the "provocation" and "cooling off" components of CALCRIM No. 570 as proof that the prosecutor's arguments were prejudicial.  We disagree.

There are two exceptions to the rule that failure to object to prosecutorial misconduct forfeits the issue on appeal:  "(1) the objection and/or the request for admonition would have been futile, or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct." (*People v. Panah*, *supra*, 35 Cal.4th at p. 462.)  "A defendant claiming that one of these exceptions applies must find support for his or her claim in the record.  [Citation.]  The ritual incantation that an exception

13

applies is not enough." (*Ibid.*, *citing People v. Boyette* (2002) 29 Cal.4th 381, 432.)

In *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*), the California Supreme Court clarified "what kind of provocation will suffice to constitute heat of passion and reduce a murder to manslaughter." (*Id.* at p. 938.) The Supreme Court rejected the argument that "the provocation must be of a kind that would cause an ordinary person of average disposition to *kill*." (*Ibid.*) "The proper standard focuses upon whether the person of average disposition would be induced to react from passion and not from judgment." (*Id.* at p. 939.) The court expressly held that CALCRIM No. 570 correctly stated the law and was not ambiguous as written,[8] however, as in this case, "the parties' closing arguments muddied the waters" regarding the proper interpretation of the instruction. (*Beltran,* at p. 954.)

We agree with defendant that the portions of the prosecutor's closing arguments which invited the jurors to consider whether a reasonable person, or they themselves, would have "cooled off" and stopped choking their unconscious spouse constitute misconduct. Although " ' " 'a prosecutor is given wide latitude during argument' " ' " (*People v. Hill*, *supra*, 17 Cal.4th at p. 819; *People v. Centeno* (2014) 60 Cal.4th 659, 666), this does not include " ' " 'the use of deceptive or reprehensible methods to attempt to persuade

_____

[8] This court need not further address defendant's argument that CALCRIM No. 570 is ambiguous because, as defendant acknowledges, defendant did not request clarification at trial, and because the instruction has previously been found to correctly and unambiguously state the law. (*Beltran supra,* 56 Cal.4th at pp. 954, 956; see also, *People v. Jones* (2014) 223 Cal.App.4th 995, 999.) Moreover, because the instruction correctly stated the law, defendant's counsel was not deficient in failing to object to the court giving CALCRIM No. 570 unmodified, or in arguing that the instruction should be repeated in its entirety in response to the jury's query.

14

either the court or the jury.' " ' " (*Hill*, at p. 819; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.)  Not only did the cited portion of the prosecutor's closing argument misstate the correct legal standard, as articulated in *Beltran*, it also impermissibly appealed to the fears or passions of the jury.  While we do not condone the prosecutor's misstatement of the law or improper manipulation of the jury, we nevertheless conclude that an objection was required to reserve the issue of prosecutorial misconduct for appeal.

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.]  In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements  [Citation.]' " (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)  For example, in *People v. Najera* (2006) 138 Cal.App.4th 212, the prosecutor made a closing argument similar to the argument complained of in this case, stating, " '*Would a reasonable person do what the defendant did*? Would a reasonable person be so aroused as to kill somebody?' " (*Id*. at p. 223), yet the court held that the claim of prosecutorial misconduct had been forfeited by failing to object.  (*Ibid*; see also, *Beltran, supra,* 56 Cal.App.4th at pp. 954–955.)

As discussed above, the jury was properly instructed with CALCRIM No. 570.  The court further instructed the jury that any conflict between the attorney's arguments and the jury instructions must be resolved in favor of the jury instructions.  "Arguments by counsel 'generally carry less weight with a jury than do instructions from the court.' " (*People v. McDowell* (2012) 54 Cal.4th 395, 438.)  "Jurors are presumed able to understand and . . . to

15

have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The mere fact that the jury requested clarification about the "heat of passion" is insufficient to demonstrate that the jury relied on the prosecutor's improper closing argument instead of the court's instructions.

Based on the foregoing, we find that a timely objection to the prosecutor's closing argument would not have been futile and that a request for admonition would likely have cured the alleged harm arising from the prosecutor's closing argument. "Because 'any harm could easily have been cured, the contentions are not cognizable on appeal.'" (*People v. Riel* (2000) 22 Cal.4th 1153, 1197.)

## II.

### *Defendant Forfeited His Claim That the Trial Court Abused its Discretion in Imposing a 10-year Restraining Order by Failing to Object*

"[T]he right to challenge a criminal sentence on appeal is not unrestricted. In order to encourage prompt detection and correction of error, and to reduce the number of unnecessary appellate claims, reviewing courts have *required* parties to raise certain issues at the time of sentencing. In such cases, lack of a timely and meaningful objection forfeits or waives the claim." (*People v. Scott* (1994) 9 Cal.4th 331, 351.)

Defendant acknowledges that the trial court was authorized to impose a criminal protective order of up to 10 years to protect victims of domestic violence; he does not dispute that his son is a victim entitled to such protection. Defendant concedes that he did not object to the trial court's imposition of the criminal protective order. As the trial court's order was authorized by statute, defendant's failure to object at the time of sentencing forfeits his right to appeal the order. (*People v. Scott, supra,* 9 Cal.4th at p. 351.)

16

# III.

## *Defendant Failed to Establish That His Sixth Amendment Right to Effective Counsel Was Violated*

In the event that his claims of error are deemed forfeited, defendant asks this court to find that defense counsel rendered ineffective assistance by failing to object to the prosecutor's closing argument and/or failing to object to the court's imposition of a 10-year restraining order at judgment and sentencing. "To show ineffective assistance of counsel, defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there was a reasonable possibility that, but for counsel's unprofessional errors, the result would have been different." (*People v. Kelly* (1992) 1 Cal.4th 495, 520, *citing Strickland v. Washington* (1984) 466 U.S. 668, 687–688, 693–694.) Defendant has not met either prong of this test.

## A. Defense Counsel's Failure to Object to the Prosecutor's Closing Argument Does Not Constitute Ineffective Assistance of Counsel

To determine whether defense counsel rendered ineffective assistance in failing to object to the prosecutor's closing argument, the reviewing court must determine whether the argument constituted error. (*See, e.g., People v. Silva* (2001) 25 Cal.4th 345, 374.) As discussed above, a portion of the prosecutor's closing argument mis-stated the provocation and "cooling down" elements required for a finding of voluntary manslaughter and improperly manipulated the jurors' emotions. However, the finding that defense counsel had a basis to object to the prosecutor's closing argument does not end the inquiry.

"[T]he mere failure to object rarely rises to a level implicating one's constitutional right to effective legal counsel." (*People v. Boyette, supra,*

17

29 Cal.4th at p. 433.)  " '[C]ompetent counsel may often choose to forgo even a valid objection.  "[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings.  The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal." ' "  (*People v. Farnam* (2002) 28 Cal.4th 107, 202.)

It is defendant's burden to demonstrate that his trial counsel lacked a tactical reason for failing to object to the prosecutor's closing argument. " 'When a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation.  If the record sheds no light on why counsel acted or failed to act in the manner challenged, ". . . unless there simply could be no satisfactory explanation" [citation], the contention must be rejected.' [Citation.]  A reviewing court will not second-guess trial counsel's reasonable tactical decisions."  (*People v. Kelly, supra,* 1 Cal.4th at p. 520.)

In this case, defense counsel may have made a tactical decision not to object because he knew that the court had correctly instructed the jury on voluntary manslaughter and that the prosecutor had accurately stated the standard earlier in his closing argument.  Defense counsel was also aware that he would get an opportunity to address the prosecutor's erroneous statements in his closing argument.  Perhaps defense counsel simply did not wish to call attention to the erroneous portions of the prosecutor's argument.  Because the record is silent on the rationale for failing to object, and defense counsel may have had a tactical reason for doing so, defense counsel's failure to object did not fall below an objective standard of reasonableness under prevailing professional norms.

18

Finally, " ' "[m]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in [*People v.*] *Watson* [(1956) 46 Cal.2d 818.]' [Citations.] '[U]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.' " (*Beltran, supra,* 56 Cal.4th at p. 955.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is likely to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, at p. 956.) In this case, it is improbable that defendant would have obtained a more favorable result if his trial counsel had objected to the prosecutor's closing argument because the evidence supporting the prosecution's theory was strong, while the evidence of provocation was weak.

The prosecution presented compelling evidence which supports the jury's finding that defendant murdered his wife. Defendant frequently expressed the desire to kill his wife both before and after her death. Defendant admitted that he was under the influence of alcohol and methamphetamine at the time he argued with Emiley in the early hours of Christmas morning. He admitted choking Emiley until she fell down, and then continuing to choke her until she died. The forensic pathologist testified that defendant likely had to apply pressure to Emiley's neck for four to six minutes in order to extinguish her life. Defendant hid Emiley's body and lied

19

repeatedly to her family, friends, and employer about what had happened to her, as well as lying initially to law enforcement and the jury about choking her.

To establish that a person killed in the heat of passion, " '[t]he provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment.' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 826.) For example, a "tussle" in which the victim scratched the defendant's chest, kicked him in the leg, and grabbed his shirt, was held not to arise to the level of provocation necessary to support a voluntary manslaughter instruction in *Gutierrez.* (See also, *People v. Najera*, *supra*, 138 Cal.App.4th at p. 226 [a defendant suffers no prejudice from counsel's failure to object if insufficient evidence of heat of passion to support jury instruction on voluntary manslaughter].)

In this case, defendant testified that Emiley struck him on the back of his head because she was angry that he used her cell phone. The autopsy findings did not disclose injuries to Emiley's hands consistent with striking someone on the back of the head. Although other witnesses testified that they heard defendant and Emiley arguing, defendant was the witness who testified about how the altercation occurred. Defendant's credibility and veracity were repeatedly called into question throughout the trial. In light of the evidence presented, the jury was unlikely to have come to a different conclusion even if defendant's trial counsel had objected to the improper portion of the prosecutor's closing argument.

**B. Counsel's Failure to Object to Imposition of a 10-year Restraining Order Does Not Constitute Ineffective Assistance of Counsel**

Defendant acknowledges in his opening brief that the trial

court had a factual and a legal basis to impose a restraining order precluding defendant from contact with his minor son for up to 10 years. In arguing that his counsel was constitutionally deficient for failing to object to imposition of the restraining order, defendant argues that given the baby's age, the duration of the restraining order is the functional equivalent of terminating defendant's parental rights, and that defendant's conduct did not support issuance of a restraining order of this duration. Neither point has merit.

The record contains ample evidence supporting the trial court's discretionary decision to impose a restraining order for a 10-year term. Defendant strangled the baby's mother while the baby was present in the room. Defendant was physically and verbally abusive to the baby on numerous occasions. Additionally, defendant's physical and emotional abuse of the baby's older siblings supports an inference that the risk to the baby would not necessarily end when the child grew older. "[I]n determining whether to issue a criminal protective order pursuant to section 136.2, a court may consider all competent evidence before it." (*People v. Race* (2017) 18 Cal.App.5th 211, 220.) "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.)

Contrary to defendant's assertion, "the criminal protective order is not the functional equivalent of an order terminating parental rights. . . . [U]nlike a parent who has had his parental rights terminated, defendant can move the court to rescind the order upon his release from prison" and "section 136.2 provides mechanisms for cooperation between the criminal, juvenile, and family law courts to permit communication by the subject of the criminal protective order with members of his family if appropriate." (*People v. Race*, *supra*, 18 Cal.App.5th at p. 220.) Trial counsel was not deficient in failing to

21

object to the restraining order because the trial court acted within its discretion pursuant to section 136.2 in issuing the order. (*People v. Beckemeyer* (2015) 238 Cal.App.4th 461, 465–466.)

## DISPOSITION

The judgment is affirmed.

_____
Mayfield, J.*


We concur:


_____
Richman, Acting P.J.


_____
Miller, J.


*People v. Hughes* (A161730)


      * Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


23